## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 08 C 237 |
| | ) | Hon. John Darrah |
| FUNDS IN THE AMOUNT OF $101,999.78 | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### CLAIMANTS REPLY MEMORANDUM IN SUPPORT OF MOTION
### FOR JUDGMENT ON THE PLEADINGS

Though the government agrees with claimants that 31 U.S.C. § 5324 does not require persons to accumulate their cash deposits until they exceed $10,000 (Gov t Mem. at 8-9), such a requirement rests at the very core of the government s complaint. Accordingly, by the strength of the government s own concession, this case should be dismissed and judgment entered in the claimants favor.

### Introduction

For purposes of this motion, we accept the well-pled allegations in the government s complaint as true. Briefly, it alleges that the claimants owned two motels, Hillside Manor and Karavan. (Complaint, ¶ 7). The rooms in each motel rented for somewhere around $50 a night. (*Id.*, ¶ 7). With the number of available rooms the total amount that could possibly be generated by each motel on a given night ranged from $1500 to $3000. Many renters paid cash. The government alleges that the claimants illegally structured the cash by making multiple $8000 bank deposits in different banks on the same day. (*Id.*, ¶ 8). The purpose for doing so was to keep the total of each deposit below $10,000. (*Id.*, ¶ 8). Bank deposits exceeding $10,000

required the bank to file a currency transaction report with the Department of the Treasury. (*Id*., ¶ 5).

Superficially, the government s complaint might seem to make a claim for money structuring: three hundred deposits over three years in $8000 increments. A closer reading reveals otherwise. Contrary to its argument, the complaint does not show alternating deposits into multiple bank accounts, but instead the mundane deposit of cash received by one motel being deposited into one bank account, and cash received from the other motel being deposited into a separate bank account. The complaint reveals further that the claimants lacked any incentive to  structure,  as they received the cash at issue in increments that were already less than $10,000.

## ARGUMENT

### A. The Complaint and Exhibit Do Not Allege
### Alternating Deposits Into Multiple Bank Accounts

The government s description of the deposits is, for the most part, wrong. For instance, relying on Exhibit A of the Complaint, the government states that on 17 days between March 9, 2004 and September 30, 2004, the Patels made  two deposits in one account on one day.  (Gov t Mem. at 3).  In fact, they didn t.  On each day described, the Patels allegedly made one deposit into their Fifth Third Bank account (the Hillside Manor Motel bank account), and one deposit into their Mid America Bank account (the Karavan Motel bank account).  They did not make two deposits into one account on one day.

Take the first date as an example. According to the government, on March 9, 2004, the Patels made two deposits into one account. (Gov t Mem. at 3).  Exhibit A reveals, however, that

2

on March 9, 2004, the Patels made one cash deposit into Fifth Third for $8000, and one cash deposit into Mid America for $8000. Those are two separate accounts, one related to Hillside Manor and the other to Karavan. They are not two deposits on the same day into one account.

The very next date can serve as the very next example. According to the government, on March 17, 2004, the Patels made another two deposits into one account. (Gov t Mem. at 3). Exhibit A reveals, however, that on March 17, 2004, the Patels made an $8000 cash deposit into Fifth Third (the Hillside Manor account) and an $8000 cash deposit into Mid America (the Karavan account). Again, these are two deposits into two logically separate accounts, not two deposits into one bank account on the same day, as the government describes in its memorandum.

We belabor the point with one last example, the third date identified by the government. The government says that on March 23, 2004, the Patels once again made two deposits into one account. (Gov t Mem. at 3). But Exhibit A reveals that on March 23, 2004, the Patels made a cash deposit of $8000 into the Fifth Third account (Hillside) and a cash deposit of $8000 into the Mid America account (Karavan). Once again, the government is dead wrong when it says that the Patels made two deposits into one bank account.

The remaining days identified by the government in Exhibit A reflect the same thing as the first three dates. Exhibit A therefore thoroughly undermines the government s factual description in its own complaint: that the Patels maintained multiple bank accounts in the names of the two motels, and made their cash deposits into these accounts ... by depositing no greater than $8000 on any given day and by alternating deposits among the multiple bank accounts ... and then transferring the cash deposits by check to brokerage accounts. (Complaint, ¶ 9).

Instead, the facts alleged show that the claimants made single deposits into two separate bank accounts, one in the name of the Hillside Manor Motel and the other in the name of the Karavan Motel. Nothing suspicious arises from separate bank accounts for separate businesses. As for transferring money *from* one of the two bank accounts into an investment account, Exhibit A reveals that these transfers were usually for well *above* $10,000 and therefore raise no suspicion at all.

Thus, the government memorandum speaks of multiple bank accounts in the names of the two motels, but the government s own Exhibit A shows that each motel had only one active bank account at any given time. Karavan Motel had two accounts, but not at the same time. Exhibit A reveals that an original Karavan bank account was closed, and a second bank account opened. Once Karavan opened the second account, however, the motel ceased using the first one. One would think that if the claimants were bent on structuring transactions they would have maintained both bank accounts, and made less than $10,000 deposits into each. Exhibit A to the government s complaint therefore not only refutes the allegation of alternating deposits into two bank accounts, but negates any inference that money structuring was the objective. By closing the first bank account upon acquiring the second and not using them both at the same time, the claimants eliminated their best opportunity to illegally structure, raising an inference contraindicative of structuring.

### B. The Law Does Not Require Persons to Accumulate Cash In Order to Make $10,000 Deposits

The claimants did not have to tinker with the cash received by the motels if, for the sake of argument, they had any concerns about the banks reporting requirements. Based on the

allegations in the complaint, they allegedly received the cash in amounts of less than $10,000 from each guest.  They could have deposited the money into the bank upon receipt and the bank would not have filed a currency transaction report.  Even on a daily basis the motels received less than $10,000 in receipts, so cash could have deposited into the bank without worry.

The government argues, however, that it is not basing its complaint solely on the fact that the deposits were all under the $10,000 threshold, but also based on the number of $8000 deposits alleged to be 330.   The consistency in the amount and the frequency, it says, supports an inference that the deposits were not the normal cash proceeds of a day s or a few days  business. (Gov t Mem. at 9-10).

If the anti-structuring law required one to make his business deposits consistent with his daily receipts, three-hundred and thirty $8000 deposits might very well be probative.  But that is not the law.  The law is that one cannot structure his deposits in order to deceive a bank into not filing a currency transaction report.  And the fact that these deposits were inconsistent with ordinary variations of business does not imply that claimants were trying to deceive the banks for at least one simple reason:  if the claimants were motivated to avoid the filing of currency transaction reports they could have deposited the funds the day they received them.   They did not need to  accumulate  the deposits if they wanted to  hide  the money from the peering eyes of the Treasury.  Accumulation and consistency gained only the government s attention.  If this behavior was a scheme, the mechanics of it operated to expose the conduct rather than keep it a secret.

Suppose the claimants waited two days to make their cash deposits: the deposits would be under $10,000, and the government could accuse them of illegal structuring.  Under the government s theory, depositing every other day, every day, or two times a day, the claimants

5

impliedly violated the anti-structuring laws.  Essentially, the government proposes that any cash business that deposits earnings in less than $10,000 increments violates the law.  Businesses dealing in cash that do not hold onto their currency until it reaches $10,000 would commit illegal structuring.

The government accuses the claimants of relying on  unsupported facts.  (Gov t Mem. at 7).  First, it points to claimants  argument that if either motel filled to capacity on a single night, neither would receive receipts exceeding $10,000.  The government responds that there is no factual support for the proposition that either hotel filled to capacity on a given night.  The point of the calculation, however, was to show that even at capacity each motel earned less than $10,000 over one, two, or possibly even three nights, so that it could not be inferred that the claimants  broke down  a large amount of income to avoid the currency transaction requirements. We are not implying that the motels *were* filled to capacity, but that even *if* filled to capacity the money made on a single day did not require the filing of a currency transaction report.

Curiously, the government also identifies as an  unsupported factual claim[]  that the deposits were simply the result of a decision to deposit cash receipts into each motel s respective bank account at some point prior to reaching an aggregated $10,000. (Gov t Mem. at 8). Obviously a conscious decision had been made to deposit the money in $8000 increments, which is just as obviously an amount approaching (but less than) $10,000.  The  factual claim  here is thus  supported  -- by logic.

The government adds the additional observation that it is unlikely that  one or both of these small motels would consistently generate exactly $8000 in cash receipts more than 300 times during this period ....  (Gov t Mem. at 9-10).  If the government is implying that cash from

6

some other, possibly even illegal source, could have been integrated with the room rental money, the implication finds no support in the allegations of the complaint. The complaint does not contain a single fact or a scintilla of an allegation that would generate such an inference. The *only* money identified in the complaint comes from the motels; the *only* charge in the complaint is money structuring, not money laundering.

The cases cited by the government get it nowhere. In *United States v. Van Allen*, 525 F.3d 814 (7th Cir. 2008), the defendant made multiple cash deposits at multiple bank branches on the same day (*e.g.*, count 24: four separate bank deposits totaling $25,795, each under $10,000, at three separate bank branches). In the circumstances of *Van Allen*, the choice of deposits and withdrawals was, as the government quotes in its memorandum, irrational and inefficient, leading to $100,000 in check cashing fees at one currency exchange. Here, there is nothing irrational and inefficient about claimants making separate deposits for each motel. The fact that the claimants apparently made their bank deposits only in $8000 increments may seem odd, but odd is not illegal. Their conduct might even be considered rational and efficient. Still, if the claimants wanted to avoid having the banks file currency transaction reports, they merely had to deposit the money every day.[1]

The claimant in *Van Allen* actually raised the issue of whether a person theoretically could

---

[1] According to the complaint, from March 2, 2004 through June 12, 2007, a period of over 168 weeks (three years, three months), 148 deposits were made into Fifth Third Bank from Hillside. From March 2, 2004 through February 27, 2007, approximately 156 weeks, 184 deposits were made into Mid America Bank from Karavan. The deposits averaged out to basically one per week, a mundane pattern of banking. That Karavan exceeded Hillside (as well as the one per week average) is equally unsurprising: it had available more rooms, which rented for more money, on any given night. *See* Complaint, ¶ 7 (Hillside: 33 units, $47 night; Karavan: 55 units, $55 night).

be compelled to maintain cash on hand until meeting the $10,000 threshold, but the Court decided the case without addressing the issue. *Van Allen*, 524 F.3d at 821. (As stated in the first sentence of this memorandum, the government believes that the statute imposes no such requirement. (*See* Gov t Mem. at 8-9).) We note in fairness, however, that *Van Allen* does not say that structuring exists only in circumstances where the person first maintained a bundle of cash that exceeded $10,000. *Van Allen*, 524 F.3d at 820-21. It can also occur where the person  alter[s] the form of the transaction  in order to avoid currency transaction laws. *Id.* at 821.

The claimants here did not  alter  the form of the transaction in order to avoid currency laws. They didn t need to. Had they employed the most logical expedient    depositing the cash the day they received it    no currency transaction report would have been required. It is the government that would require claimants to  alter the form of the transaction  in order to *implicate* the currency laws.

The government also cites *United States v. Cassano*, 372 F.3d 868, 875 (7th Cir. 2004). A defendant had set up a shell corporation which he used to obtain unentitled payments from an insurance company. Checks would be written to fictitious payees in sums of less than $10,000 to be furtively cashed at currency exchanges. In *United States v. Morales-Rodriguez*, 467 F.3d 1, 6 (1st Cir. 2006), a union Vice President issued checks to himself, all under $10,000 and made out to cash, over a three year period. In *United States v. MacPherson*, 424 F.3d 183, 190-91 (2d Cir. 2005), the defendant had been hiding $250,000 from a potential judgment creditor; over a four month period he traveled daily to three different banks to deposit the money in amounts just under $10,000, until all the money had been redeposited. In all of these cases the defendants took unusual and convoluted steps in an effort to conceal the fact that they were breaking down

sums of cash into less than $10,000 bundles.  Even the case cited by the Government to illustrate

pleading principles follows the that formula.. *See United States v. Funds in the Amount of*

*$170,926.00*, 985 F.Supp. 810 (N.D.Il. 1997).

The allegations here are distinctly different.  The claimants allegedly collected income

from two different motels.  Money from one motel was deposited in Mid America Bank and

money from the other motel was deposited in Fifth Third Bank.  For whatever reason, claimants

chose to make those deposits in $8000 increments.  They could have made the deposits in $2500

increments or $5000 increments; it still would not matter.  The point is that they did not receive an

amount larger than $10,000 on a single day and then break the deposits down.  They received

amounts significantly less than $10,000 on a single day, and apparently deposited it when it

reached a certain amount.  Ultimately, they transferred that same money into brokerage accounts

in amounts that usually far *exceeded* $10,000, further indication that the deposits were not made

to be secretive.

The government cites language from cases that express incredulity where persons cashed

scores of checks in dominations of less than $10,000, and then argued that they did not do so to

avoid currency reporting laws (*Cassano*), or where the person made multiple deposits on the same

day into multiple banks (*Van Allen*), issued illegal checks to himself, all under $10,000 (*Morales-

Rodriguez*), or traveled to multiple banks on the same day to cash multiple checks, all under

$10,000 (*MacPherson*).   In each of those cases the inference is patent that these people may have

been structuring their deposits to avoid currency reporting laws.   But that is just not the case here.

To sustain the structuring allegations here this Court would have to hold that persons commit

money structuring if they don t wait until their cash exceeds $10,000 before they make a deposit.

## Conclusion

As the government says,  the statute at issue imposes no such requirement to aggregate

funds until they equal or exceed $10,000 in order to avoid violating the [currency reporting

laws].  (Gov t Mem. at 8-9).  This case, therefore, should be dismissed and judgment entered for

claimants.

Respectfully submitted,
PRAVINCHANDRA PATEL, *et al.*,

By:    \_\_\_\_/s/ Barry A. Spevack_____
One of their attorneys

Barry A. Spevack
MONICO, PAVICH & SPEVACK
20 South Clark Street
Suite 700
Chicago, Illinois 60603
312-782-8500